**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

CHARLES AUSTIN,                                    :
                                                   :
                                    Plaintiff,     :     Civil Action No.
                                                   :
                    v.                             :
                                                   :
THE BANK OF NEW YORK MELLON                        :     **COMPLAINT**
CORPORATION, SONIA CHALIHA, MAEVE                  :
O'BRIEN and HECTOR HERRERA, in their               :
individual and professional capacities,            :
                                                   :     **Jury Trial Demanded**
                                    Defendants.     :
-------------------------------------------------------------- X

Charles Austin ("Plaintiff" or "Mr. Austin"), by and through his attorneys, Wigdor LLP,

as and for his Complaint against The Bank of New York Mellon Corporation ("BNY Mellon" or

the "Bank"), Sonia Chaliha, Maeve O'Brien and Hector Herrera (collectively, "Defendants"),

hereby alleges as follows:

## NATURE OF THE ACTION

1.      Mr. Austin brings this action to vindicate his legal rights regarding BNY Mellon's

unlawful termination of his employment as Vice President at the Bank in retaliation for Mr.

Austin's protected reports of money laundering and public corruption (and retaliation for

reporting those activities), as prohibited by the whistleblower provisions of the Sarbanes-Oxley

Act of 2002, 18 U.S.C. § 1514A ("Sarbanes-Oxley") and New Jersey Conscientious Employee

Protection Act ("NJCEPA").  Specifically, BNY Mellon terminated Mr. Austin because he

recommended that BNY Mellon end its business relationships with Global Bank Corporation

("GBC"), a client who Mr. Austin suspected to have engaged in money laundering and public

corruption.

2.      Rather than acknowledge and accept Mr. Austin's complaints, Defendants moved against Mr. Austin in an attempt to preserve (and later, restore) what they saw as a promising business prospect, even in the face of legal risk.  Indeed, Defendants soon manufactured false and pre-textual justifications for their decision to terminate Mr. Austin.  In response to Mr. Austin's repeated refusal to put potential profits before compliance and responsible business practices, Defendants turned on him, pressured him and eventually eliminated him for being willing to stand up for his honest recommendation that the Bank terminate its relationship with GBC, despite its unpopularity with his managers.  Mr. Austin based his recommendation regarding GBC on a weeks-long investigation.  BNY Mellon and its management, for their part, made it clear that they expected their business priorities to be rubber-stamped, and Mr. Austin paid the price with his job when he refused to fall in line.

3.      Mr. Austin seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful retaliation in violation of the Sarbanes-Oxley Act and NJCEPA.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1514(A), as this action involves federal questions regarding the deprivation of Plaintiff's rights under Sarbanes-Oxley.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State law pursuant to 28 U.S.C. § 1367(a).

5.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

6.      On May 1, 2018, Plaintiff filed a Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the whistleblower anti-retaliation provisions of Sarbanes-Oxley (hereinafter, the "Administrative Complaint").

7.      At the time of the filing of this Complaint, it has been more than 180 days since Plaintiff filed his Administrative Complaint and OSHA has not issued a final decision. Accordingly, Plaintiff is entitled to seek *de novo* review of his Complaint from this Court.

8.      By letter dated October 30, 2018, Plaintiff informed OSHA that Plaintiff intended to seek *de novo* review in this Court rather than continue to seek relief through OSHA's procedural mechanisms.

9.      On November 2, 2018, OSHA informed Plaintiff's counsel that, upon receipt of the filed Complaint in this action, OSHA will allow the administrative withdrawal and dismissal of the Plaintiff's Administrative Complaint.

10.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

11.     Mr. Austin worked as a Vice President and Senior Relationship Manager at BNY Mellon.  Mr. Austin is a resident of New Jersey and, at all relevant times, met the definition of Defendants' "employee" under all applicable statutes.

12.     Defendant The Bank of New York Mellon Corporation is a Delaware foreign business corporation with its principal place of business located at 225 Liberty Street, New York, New York 10281.  At all relevant times, BNY Mellon was an "employer" under all relevant statutes.

3

13. Defendant Sonia Chaliha is Global Head of Sales (currently reflected as Head of Sales and Relationship Management for the Latin American and Canadian Corporate Trust ("LATAM CANADA") on the Bank's website) at BNY Mellon.  Ms. Chaliha is a resident of New York and, at all relevant times, met the definition of Plaintiff's "employer" under all relevant statutes.

14. Defendant Maeve O'Brien is a Managing Director at BNY Mellon.  Ms. O'Brien is a resident of Connecticut and, at all relevant times, met the definition of Plaintiff's "employer" under all relevant statutes.

15. Defendant Hector Herrera is a Vice President of Global Trust Services at BNY Mellon.  Mr. Herrera is a resident of New Jersey and, at all relevant times, met the definition of Plaintiff's "employer" under all relevant statutes.

## **FACTUAL ALLEGATIONS**

## I.   **MR. AUSTIN'S PROFESSIONAL BACKGROUND**

16. In 2005, Mr. Austin began his career with the Bank as a Trust Associate in the Global Americas, Corporate Trust Division.

17. Many front office and mid-office employees in the Corporate Trust Division work in the Bank's offices located in Woodland Park and Jersey City, New Jersey.

18. At times during his employment, Mr. Austin worked for the Bank while he was located in New Jersey by working remotely on his personal computer.  Additionally, Mr. Austin used his personal mobile device while located in New Jersey to conduct business for the Bank, including participating on work-related calls and sending and responding to work emails.

19. During more than two years as a Trust Associate, Mr. Austin, *inter alia*, provided support to the Client Services Managers for the day-to-day administration of client accounts,

prioritized workflows, gained a working knowledge of global markets and structured products, and performed account reconciliations and analysis.

20.     In or around 2008, Mr. Austin was promoted to Senior Associate within the Global Structured Finance, Corporate Trust Division at the Bank.

21.     As a Senior Associate, Mr. Austin supported more than 100 client accounts, provided client services and was responsible for coordinating client and investor inquiries.

22.     In 2009, Mr. Austin received the "Above and Beyond Award" for his excellent customer service.

23.     Mr. Austin was promoted again in 2010 to Vice President, Senior Client Service Manager within the Bank's Corporate Trust Division.  In that role, Mr. Austin managed domestic and international client relationships and helped generate new and increase existing revenue opportunities within Corporate Trust.

24.     In or around 2012, Mr. Austin transitioned into the newly created role of Vice President, Relationship Manager within the LATAM CANADA Team.

25.     In November 2013, Mr. Austin briefly left the Bank to pursue an opportunity with Deutsche Bank.

26.     During his brief employment at Deutsche Bank, Mr. Austin managed a portfolio of international client accounts, primarily focused on relationship and account management.

27.     In or around late 2013, Mr. Austin met Ms. Chaliha for coffee and, during their conversation, Ms. Chaliha brought up the possibility of Mr. Austin returning to the Bank and told Mr. Austin that he would be a "preferred candidate," but that he still would have to go through the Bank's hiring process.

28.     In January 2014, Ms. Chaliha informed Mr. Austin that he would be contacted by Peter Kempton, a recruiter for the Bank who processed Mr. Austin's application.

29.     In February 2014, the Bank rehired Mr. Austin as a Vice President, Senior Relationship Manager, which was essentially a promotion from his previous position with the Bank.  This position was later renamed Principal Relationship Manager.

30.     In addition to elevating Mr. Austin from the position he previous held at BNY Mellon, the Bank also increased Mr. Austin's salary to match what he had been paid at Deutsche Bank.  Between February 2014 and December 2017, Mr. Austin diligently performed his duties for the Bank, including managing a portfolio of international client accounts, cultivating relationships with C-Suite executives and heads of government, and developing strategic business opportunities, while also managing many other client relationships.

31.     Mr. Austin's services brought annual revenue to the Bank of approximately $5,000,000.

32.     In recognition of his performance after his return to the Bank, Mr. Austin consistently received praise for his work and had outstanding performance reviews in 2014, 2015 and 2016.  Each of these performance reviews rated Mr. Austin as having achieved his goals or more than fulfilled expectations.

## II.     MR. AUSTIN RESEARCHES ALLEGATIONS OF MONEY LAUNDERING AND PUBLIC CORRUPTION BY A CLIENT

33.     In or around early March 2017, the Bank became aware of reports that a number of Panamanian banks were involved in a money laundering and public corruption scheme in 2015, of which the Bank had not previously been aware.

34.     Although no formal charges were ever filed, several of the Bank's clients, including GBC and its Chief Executive Officer ("CEO") and Executive Vice President, Jorge E.

Vallarino, Jr., and other GBC executives and legal representatives were alleged to have participated in this scheme. Mr. Vallarino was one of a handful of GBC executives capable of instructing the Bank to transfer money in and out of the account the Bank maintained for GBC.

35.     On March 10, 2017, the reports regarding GBC were escalated to David Wildner, Managing Director and Chairman of the Bank's Anti-Money Laundering Operating Committee ("AMLOC"), which monitors and investigates risks that could subject the Bank to liability associated with a client's participation or alleged participation in money laundering.

36.     Typically, after learning of allegations of money laundering against a client, the Bank begins a multistep process in order to determine if the allegations warrant further investigation, including the preparation of high-risk AMLOC memoranda and presentations. As part of that process, the Bank usually generates a report using World-Check, a Thompson Reuters product used "to help [companies] meet [their] regulatory obligations, make informed decisions, and help prevent [companies] from inadvertently being used to launder the proceeds of crime or association with corrupt business practices."[1]

37.     The Bank maintains an office located in Jersey City, New Jersey which performs certain major functions for the Bank, including overseeing client accounts, ensuring compliance with contractual, operational and federal Know Your Client ("KYC") responsibilities, advising clients on best practices, organizational solutions and regulatory changes, and providing support to the Bank's Relationship Management function.

38.     Upon information and belief, the Bank's Jersey City location also assists in addressing operational issues, which includes ensuring all relevant documentation and recordkeeping requirements are met and identifying and resolving escalated and/or complex

---

[1]     See https://risk.thomsonreuters.com/en/products/world-check-know-your-customer.html.

problems in client accounts, and conducting audits to identify meaningful issues, risks and other exposures within Investment Services.

39.     After learning of the money laundering allegations against GBC, the Bank failed to engage in any initial formal review process pertaining to the allegations against GBC and Mr. Vallarino.  Instead, Mr. Wildner requested that Mr. Austin, the Client Relationship Owner on the account, conduct an investigation into any negative information concerning GBC and present his findings at an AMLOC meeting in April 2017.

40.     During his employment at the Bank, Mr. Austin, as a Vice President and Senior Relationship Manager, conducted approximately 20 AMLOC investigations, but this was the first time that AMLOC's Chairman personally directed Mr. Austin to conduct an investigation. The Bank also only provided Mr. Austin with limited and basic information regarding the allegations against GBC and, as a result, Mr. Austin was forced to rely on publically available information.

41.     When Mr. Austin inquired as to whether the Bank would provide any additional information regarding the money laundering allegations against GBC, Mr. Wilder responded in an email that: "I think the expectation is that you should search the name of your client and the banker [] and address the negative news you find."

42.     After learning of Mr. Wildner's request, Mr. Austin informed Ms. O'Brien, who immediately instructed him to speak with Hector Herrera, a Vice President of Global Trust Services who was the salesperson who brought GBC to the Bank as a client.  Ms. O'Brien also demanded that Mr. Herrera be involved in Mr. Austin's investigation and that Mr. Herrera, not Mr. Austin, be the point of contact between the Bank and GBC.

43.     Upon information and belief, Mr. Herrera worked from the Bank's Woodland Park location on a nearly weekly basis and conducted business related to the Bank's relationship with GBC out of that office.  In connection with the Bank's relationship with GBC, Mr. Herrera worked with Alicia Coronado, the Client Services Manager assigned to GBC, who was based out of the Bank's Woodland Park location.

44.     The Bank's Anti-Money Laundering and Know Your Client policies prohibited a sales employee, such as Mr. Herrera, from being involved in an AMLOC investigation regarding one of his own clients in order to avoid any conflict of interest or even the appearance of any such conflict.

45.     At the time Ms. O'Brien mandated that Mr. Herrera be included in the AMLOC investigation into GBC, Mr. Herrera had been working for several months to secure new business with GBC on the Bank's behalf.  Mr. Austin expressed his concerns about Mr. Herrera's involvement with the GBC AMLOC investigation to Ms. O'Brien, but Ms. O'Brien continued to insist that Mr. Herrera be included.

46.     Soon after being informed of the investigation into GBC, Mr. Herrera expressed his apprehension that Mr. Austin's investigation could derail future business with GBC that Mr. Herrera was seeking to bring into BNY Mellon.

47.     On or about March 16, 2017, Mr. Herrera emailed various individuals at GBC, tipping them off to the ongoing investigation.

48.     This action was in direct violation of the Bank's policy that due diligence investigations not be discussed with clients.

49.     It was well known within the department that Mr. Herrera had a personal relationship with the CEO of GBC, Mr. Vallarino.  On at least one occasion, Mr. Vallarino was referred to as "Hector's boy," in reference to this close personal association.

50.     When Mr. Herrera received a response from GBC denying any wrongdoing, he forwarded the email to Mr. Austin, and continued to barrage Mr. Austin with emails seeking additional information on the status of the investigation and whether it would impact potential business that Mr. Herrera was working on with GBC.

51.     In an apparent effort to get Mr. Austin to overlook the reports of potential money laundering and corruption, Mr. Herrera demanded that Mr. Austin "get on top of this, right away. GBC and other banks in Panama are important relationships and growth clients."

52.     Ms. O'Brien also instructed Mr. Austin to contact Carlos Costa and Joseph Costantino, other BNY Mellon Relationship Mangers who regularly worked with clients viewed as possible risks, in connection with Mr. Austin's AMLOC investigation and memorandum.  Mr. Costantino frequently worked in the Bank's Woodland Park location and was originally assigned to the GBC account before the Bank transferred the account to Mr. Austin.

53.     Mr. Costa and Mr. Costantino emphasized to Mr. Austin that Ms. O'Brien had significant influence in the preparation of their AMLOC memoranda for clients that were recognized compliance risks, and warned Mr. Austin to "be careful" in conducting his investigation and preparing his memorandum, because the manner in which Mr. Austin proceeded could impact the Bank's relationship with GBC.

54.     Ms. O'Brien, by way of downplaying the situation with GBC, pointed out to Mr. Austin unrelated AMLOC memoranda prepared by Mr. Costa and Mr. Costantino regarding

other BNY Mellon clients that she claimed were "more robust in terms of allegations than what is present on this Global Bank situation."

55.     Additionally, Ms. O'Brien denied Mr. Austin's request for access to information contained in GBC's account with the Bank, and stated that the Bank supposedly could not be implicated in money laundering given the Bank's role as a Trustee for the GBC account.  As a result, Ms. O'Brien prevented Mr. Austin from obtaining information regarding transactions associated with the GBC account.

56.     As a result of Ms. O'Brien's attempts to downplay the allegations against GBC and her efforts to limit the information available to him, Mr. Austin contacted the Client Services Manager on the GBC account, Ms. Coronado, and informed her of Ms. O'Brien's conduct and inquired whether Ms. Coronado could provide him with additional information about GBC and its accounts.

57.     Before submitting the first draft of his AMLOC report regarding GBC to Ms. O'Brien, Mr. Austin informed Ms. O'Brien that the Bank could be aiding and abetting with money laundering by continuing its relationship with GBC and Mr. Vallarino and that, in light of the Bank potentially facing liability related to money laundering, he was uncomfortable adopting her recommendation that the Bank continue doing business with GBC.

58.     The Bank's connection to potential money laundering exposed the Bank to liability under federal regulations and laws, including the Bank Secrecy Act and the Patriot Act. When telling Ms. O'Brien that the Bank could be aiding and abetting money laundering with regard to GBC, Mr. Austin was aware, and believed Ms. O'Brien to be aware, that the Bank could be violating the Bank Secrecy Act, the Patriot Act and other federal laws and regulations, including KYC-related rules and anti-money laundering rules and regulations.

59.     On March 20, 2017, Mr. Austin provided Ms. O'Brien with his first draft of the
AMLOC memorandum regarding GBC.  In that document, Mr. Austin recommended that the
Bank terminate its relationship with GBC due to various concerns.  However, per Ms. O'Brien's
instructions, the section of the memoranda related to the rationale for taking on or maintaining
GBC as a client was left blank so that Ms. O'Brien could discuss that section with Mr. Austin
before it was drafted.

60.     In response to this first draft, Ms. O'Brien requested that Mr. Austin's report
instead recommend that the Bank merely monitor the situation closely, and not that it terminate
the relationship, and further directed that Mr. Austin do more research and then revise the report.

61.     Ms. O'Brien also instructed Mr. Austin to downplay the allegations against GBC
and demanded that the revised AMLOC memoranda include specific language, including:

> The systems in place including WorldCheck need to be examined
> and understood, as to why the negative news as described in this
> memo was not captured. The business intends to reach out to
> Abbey Lisbon of the COE to assist our efforts in examining the
> underlying cause(s) or enhancement(s) needed to ensure future
> negative news is captured. In the interim, the business is limited to
> monitoring these events via internet searches and publically
> available information. Given our role as Trustee only and the
> negative news outstanding, *the business will continue to monitor
> the progress of these open matters and advise AMLOC of any
> changes or new developments*.

62.     Furthermore, Ms. O'Brien indicated that she had been keeping Ms. Chaliha
abreast of the matter, and stated that Ms. Chaliha would not approve the report as it was
currently written.

63.     Upon information and belief, Ms. Chaliha, as the Managing Director of LATAM
CANADA, was aware of Mr. Austin's report and approved of Ms. O'Brien's recommendations

regarding revising the report to recommend close monitoring of the situation rather than termination of the GBC relationship.

64.     Indeed, during Mr. Austin's investigation, Ms. Chaliha ominously informed Mr. Austin that she could hear and see everything going on in the LATAM CANADA Corporate Trust Division from her office.

65.     On March 21, 2017, Mr. Austin sent a revised report to Ms. O'Brien and later followed up by asking what action she recommended that the Bank take.

66.     Ms. O'Brien responded that, if she were the relationship manager, and despite the red flags raised by the allegations, she would recommend close monitoring of the situation, "given the time that has passed between the allegation, [the] absence of conviction and [the Bank's] defined Roles and that there are no large penalties allocated by the regulator."  Ms. O'Brien commanded Mr. Austin to include this language in the revised GBC memorandum, despite his misgivings, and he did so.

67.     The revised version of Mr. Austin's memorandum was then submitted to Mr. Wildner for approval prior to the AMLOC meeting, but Mr. Wildner refused to endorse the memorandum with the language that Ms. O'Brien demanded be included.

68.     As a result, Mr. Austin had to prepare another version of the memorandum that excised Ms. O'Brien's language regarding mere monitoring of the situation.

69.     Mr. Austin finalized his report in or around early April 2017, and soon thereafter submitted the report to the Compliance Department for approval before the report was filed with AMLOC.  For this new version of the memorandum and report Mr. Austin was prohibited from stating that the Bank should terminate its relationship with GBC.  However, Mr. Austin had

wished and believed appropriate, that the GBC relationship be severed based on various

concerns, including that:

- the Office of the Special Prosecutor for Organized Crime at the Public Ministry of Panama stated in a court filing that a criminal complaint alleged, *inter alia*, that Jorge E. Vallarino, GBC's CEO, "engaged in Money Laundering associated with the Program of Ayuda Nacional,"

- the allegations against Mr. Vallarino "[s]tem from the ongoing investigation into Ricardo Martinelli administration (president of Panama 2009-2014) who is alleged to have colluded with 13 banks in Panama (including Global Bank Corporation)…"

- "News reports throughout Panama seem to indicate that Global Bank Corporation has played a role in Money Laundering associated with [President Martinelli's administration.]"

- "It has been reported that 25 major banks, mostly in the United States and Europe, have cut off their corresponding bank relationships with banks in Panama."

- "An article in the New York Times dated December 2016, noted that Global Bank Corporation is one of three banks based in Panama whose outlook was revised by S&P to negative from stable.  In their consideration they noted 'shortfalls in regulation, supervision, governance and transparency in the Panamanian financial system.'"

- "An article from January 2017 stated that a fine was imposed on Global Bank Corporation of (equivalent of) USD 42,500, by the Panamanian Banking regulator for breaches of various rules, which occurred in November 2014, November 2015, and January 2015."

- during the investigation into the allegations against GBC, "we were unable to determine any concrete evidence suggesting the negative news involving Money Laundering has been cleared."

- "The CID for Global Bank Corporation is currently noted as high given its jurisdiction and under enhanced review."

70.     Mr. Austin met with the AMLOC committee later that month and presented the

final memorandum.

71.     At the end of his presentation, Mr. Wildner asked Mr. Austin whether he believed the Bank should terminate its relationship with GBC.

72.     Mr. Austin responded that he believed the Bank should terminate its relationship with GBC, and expressed his belief that the allegations against GBC created too much potential risk for the Bank to continue doing business with GBC.  Specifically, Mr. Austin believed that the Bank could be implicated in aiding and abetting in money laundering.

73.     Shortly thereafter, in or around April 2017, the Corporate Trust Division of the Bank decided to cease all new business with GBC and to end its existing business with GBC by October 2017.

74.     As a result of the Bank's decision, a pending deal with GBC headed by Mr. Herrera was halted.

75.     Despite the Bank's policy not to discuss such resolutions with the client, Mr. Herrera reached out to Mr. Vallarino on April 21, 2017.

76.     On Monday, April 24, 2017, Mr. Herrera emailed Mr. Austin, Ms. O'Brien and Ms. Chaliha, explaining that he had spoken with Mr. Vallarino, reiterated that GBC denied any allegations of wrongdoing and attached what purported to be a judgment dismissing any action against GBC for lack of proof.

77.     Mr. Herrera requested that Mr. Austin, Ms. O'Brien and Ms. Chaliha consider these communications and attachments in permitting him to move forward with new business with GBC.

78.     Shockingly, neither Ms. O'Brien nor Ms. Chaliha objected to Mr. Herrera's request that the Bank pursue additional business with GBC, nor did they voice any disapproval

regarding Mr. Herrera tipping off GBC about the Bank's internal investigation, despite

undeniably knowing that this went against Bank policy.

### III.    MR. AUSTIN IS RETALIATED AGAINST AND TERMINATED FOR ENGAGING IN PROTECTED ACTIVITY

79.     Several days later, after receiving no response to his email, Mr. Herrera stormed

over to Mr. Austin's desk and, in front of several co-workers, confronted him regarding GBC.

80.     Loudly, Mr. Herrera demanded that Mr. Austin immediately take action to ensure

that he could continue to do business with GBC.

81.     Mr. Austin refused, saying that the Bank had made its decision and that he was

not in a position to overrule the AMLOC's mandate.

82.     Later that day, Mr. Austin, feeling that Mr. Herrera's request, and the manner in

which it was made, was entirely inappropriate, called the Bank's ethics hotline to report the

incident.

83.     In addition to reporting Mr. Herrera's retaliatory behavior on the ethics call, Mr.

Austin also complained that Mr. Herrera's involvement with his AMLOC investigation regarding

GBC was a direct violation of the Bank's policies, which did not merely protect the Bank, but

ensured compliance with federal laws and regulations, including the Bank Secrecy Act and

Patriot Act.

84.     Mr. Austin also reported on the ethics call that Ms. O'Brien and Ms. Chaliha

approved of Mr. Herrera's involvement, despite their knowledge that the Bank's policies were

being violated  and, at a minimum, that the Bank could face serious legal risks, if not more, given

that Mr. Herrera was continuing to communicate with GBC regarding the Bank's investigation.

85.     Mr. Austin further reported GBC's potential involvement with money laundering

and his belief that the Bank's relationship with GBC could result in the Bank aiding and abetting

money laundering and other violations, including violations of the Bank's Know Your Customer procedures, Patriot Act, Bank Secrecy Act and Security and Exchange Commission regulations.

86.     Mr. Austin also made clear on his call to the ethics hotline that the conduct by Ms. Chaliha, Ms. O'Brien and Mr. Herrera was directly tied to the allegations of GBC's involvement with money laundering and public corruption, as well as his belief that he was retaliated against because of his recommendation that the Bank terminate its business with GBC.

87.     Mr. Austin's complaints regarding Mr. Herrera's conduct, Defendants' efforts to frustrate and divert his investigation, as well as the violations of the Bank's policies were directly related to the Bank's exposure to liability pursuant to the Bank Secrecy Act, the Patriot Act and other federal laws and regulations, including rules and regulations administered and/or enforced by the Securities Exchange Commission.

88.     A few days later, Mr. Austin overheard Mr. Herrera discussing GBC on a telephone call which appeared to be about the ethics hotline call that Mr. Austin made.  Shortly after receiving the call, Mr. Herrera looked dejected and glared at Mr. Austin.

89.     After a few more minutes on the telephone, Mr. Herrera was quickly escorted to a closed door meeting with Ms. O'Brien.  From that day forward, Mr. Herrera rarely spoke to Mr. Austin and excluded him from meetings concerning both ongoing and potential new business, even when it normally would have been within Mr. Austin's purview.

90.     Additionally, after Mr. Austin provided his recommendation to terminate the Bank's relationship with GBC and called the Bank's ethics hotline, Ms. Chaliha distanced herself from Mr. Austin and conspicuously avoided engaging or communicating with him.

91.     On or about July 28, 2017, Mr. Austin had his yearly performance review.

92.     During this meeting, Ms. O'Brien gave Mr. Austin the first negative performance review of his career at the Bank.  Among the purported deficiencies cited, Ms. O'Brien claimed that Mr. Austin did not have as strong a first half of 2017 as he did in 2016, that he was not involved in certain transactions and/or meetings that Ms. O'Brien expected him to be involved in and that colleagues supposedly told her that Mr. Austin was somehow "unapproachable."

93.     Mr. Austin rebutted each of these accusations.  Regarding the first two criticisms, Mr. Austin said that these alleged issues were the result of Mr. Herrera cutting him out of business development opportunities and meetings after Mr. Austin's complaint regarding Mr. Herrera's inappropriate pressure and unethical conduct.  Regarding the last claim, Mr. Austin asked whether Ms. O'Brien could provide examples of how he was "unapproachable."  After struggling to provide concrete examples, Ms. O'Brien gave an example that had no relevance to Mr. Austin's role as a Principal Relationship Manager.

94.     At the end of the performance review, Mr. Austin brought up Mr. Herrera's conduct towards him after the Bank decided to stop doing business with GBC.

95.     Mr. Austin told Ms. O'Brien that, from the time since the Bank decided to cease conducting business with GBC and continuing after Mr. Austin spoke with the ethics hotline, Mr. Herrera excluded Mr. Austin from important work and ceased interacting with Mr. Austin.

96.     Moreover, Mr. Austin explained that he felt that Mr. Herrera had been unapproachable and hostile himself towards Mr. Austin for several months after the AMLOC decision regarding GBC.

97.     Shockingly, Ms. O'Brien defended Mr. Herrera's conduct, saying, in part, "Hector does not compromise the firm," and suggested that Mr. Austin had compromised the firm and was viewed as making unnecessary complaints and causing trouble.

98.     Very soon after Mr. Austin's performance review, Mr. Austin was told that a client he shared with Mr. Herrera had complained about a deposit investment option and rate of return offered by the Bank.  Mr. Austin found this odd, as he had not discussed these transactions with that client, as he customarily would in his role.

99.     When Mr. Austin contacted the customer, the customer explained that the problems were directly related to conversations the customer had with Mr. Herrera.

100.    In a further attempt to legitimize Mr. Herrera's actions and control any further escalation of the matter, Ms. O'Brien told Mr. Austin that Ms. Chaliha had granted Mr. Herrera the authority to offer a different rate to the client and told Mr. Austin that, "Sonia was aware."

101.    Under normal procedure, conversations about the administration of a client's account would be handled by a client services manager or a relationship manager like Mr. Austin, not a salesperson like Mr. Herrera.

102.    When Mr. Austin pointed this out to Ms. O'Brien, she recognized that Mr. Herrera's involvement was inappropriate, but she sought to protect Mr. Herrera from any potential consequences or scrutiny.

103.    To further protect Mr. Herrera, in the late summer of 2017, Ms. O'Brien directed Mr. Austin to fix the problem and not to put anything in writing, out of fear that the Bank and Mr. Herrera could face legal repercussions resulting from his involvement with the customer.

104.    On November 27, 2017, Mr. Austin was suddenly terminated, purportedly as part of a reduction-in-force.  His termination came just over six months after the Bank's GBC decision and a few months after his retaliatory performance review and other discussions with Ms. O'Brien and demonstrations of retaliatory animus.

105.    Upon information and belief, including conversations with other Bank employees, Mr. Herrera and Mr. Costantino had prior knowledge of the Bank's decision to terminate Mr. Austin's employment.  Therefore, it appears that Mr. Herrera and Mr. Costantino were consulted regarding and/or participated in the process or decision to terminate Mr. Austin.

106.    In accordance with the Older Workers Benefit Protection Act (OWBPA), Mr. Austin was provided a list of the job titles, job levels and ages of the individuals in his division considered for and selected for termination.

107.    The OWBPA document demonstrates that, of the 22 individuals in his division, Mr. Austin was the only employee terminated.

## FIRST CAUSE OF ACTION
### (Retaliation in Violation of the Sarbanes-Oxley Act)
### *Against All Defendants*

108.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

109.    As set forth above, Plaintiff engaged in protected activity by reporting his conclusions from an investigation into allegations that the Bank's client, GBC (and GBC's CEO), participated in money laundering and public corruption, including various legal and regulatory violations covered by SOX.  Plaintiff engaged in further protected activity, including but not limited to when he called BNY Mellon's ethics hotline to report the adverse treatment he was experiencing at the hands of Ms. Chaliha, Ms. O'Brien and Mr. Herrera as a result of his investigation, reports and recommendation that BNY Mellon terminate its relationship with GBC.

110. Defendants violated Sarbanes-Oxley by taking adverse employment actions against Plaintiff, including, but not limited to, terminating Mr. Austin's employment on November 27, 2017.

111. As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe financial, mental and emotional hardship and injury, including the loss of compensation, damage to his reputation, reduced possibilities for equivalent future compensation and other additional damages, including interest, attorneys' fees, costs and disbursements.

112. Defendants' aforementioned conduct was in violation of laws and regulations, including Sarbanes-Oxley, entitling Mr. Austin to an award of damages in an amount to be established at trial, plus interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION
### (Wrongful Termination in Violation of Public Policy)
#### *Against All Defendants*

113. Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

114. As set forth above, Plaintiff engaged in protected activity by reporting his conclusions from an investigation into allegations that the Bank's client, GBC (and GBC's CEO), participated in money laundering and public corruption, implicating various legal and regulatory violations on the part of the client and the Bank itself.  Plaintiff engaged in further protected activity, including but not limited to when he called BNY Mellon's ethics hotline to report the adverse treatment he was experiencing at the hands of Ms. Chaliha, Ms. O'Brien and Mr. Herrera as a result of his investigation, reports and recommendation that BNY Mellon terminate its relationship with GBC.

115.     Defendants also violated New Jersey public policy by taking adverse employment actions against Plaintiff, including, but not limited to, terminating Mr. Austin's employment on November 27, 2017, for his participation in protected activity.

116.     As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe financial, mental and emotional hardship and injury, including the loss of compensation, damage to his reputation, reduced possibilities for equivalent future compensation and other additional damages, including interest, attorneys' fees, costs and disbursements.

117.     Defendants' unlawful and discriminatory actions were done with willful negligence, recklessness, and/or a conscious disregard of New Jersey public policy, for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Retaliation in Violation of the New Jersey Conscientious Employee Protection Act)**
***Against All Defendants***

118.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

119.     As set forth above, Plaintiff engaged in protected activity by reporting his conclusions from an investigation into allegations that the Bank's client, GBC (and GBC's CEO), participated in money laundering and public corruption, implicating various legal and regulatory violations on the part of the client and the Bank itself.  Plaintiff engaged in further protected activity, including but not limited to when he called BNY Mellon's ethics hotline to report the adverse treatment he was experiencing at the hands of Ms. Chaliha, Ms. O'Brien and Mr. Herrera as a result of his investigation, reports and recommendation that BNY Mellon terminate its relationship with GBC.

120.     Defendants violated NJCEPA by taking adverse employment actions against Plaintiff, including, but not limited to, terminating Mr. Austin's employment on November 27, 2017.

121.     As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe financial, mental and emotional hardship and injury, including the loss of compensation, damage to his reputation, reduced possibilities for equivalent future compensation and other additional damages, including interest, attorneys' fees, costs and disbursements.

122.     Defendants' aforementioned conduct was in violation of laws and regulations, including Sarbanes-Oxley, entitling Mr. Austin to an award of damages in an amount to be established at trial, plus interest, attorneys' fees, costs and disbursements.

123.     Defendants' unlawful and discriminatory actions were done with willful negligence, recklessness, and/or a conscious disregard of the rights of Plaintiff or were so reckless as to amount to such disregard of Plaintiff's protected rights under the NJCEPA, for which Plaintiff is entitled to an award of punitive damages.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff requests that an award be issued in his favor containing the following relief:

A.     Reinstatement;

B.     Back pay, raises, bonuses, deferred compensation, benefits, reinstatement of seniority and tenure, and other orders necessary to make Plaintiff whole;

C.     An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of Sarbanes-Oxley and NJCEPA;

D.      An order prohibiting Defendants from disclosing any disparaging information about Plaintiff to prospective employers, or otherwise interfering with any applications he might make in the future;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

G.      An award of punitive damages;

H.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

I.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

J.      Such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  November 27, 2018
          New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
          Lawrence M. Pearson
          Taylor J. Crabill

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
lpearson@wigdorlaw.com
tcrabill@wigdorlaw.com

*Counsel for Plaintiff*